[Civ. No. 23580. Second Dist., Div. Three. Aug. 12, 1959.]

RAYMOND A. LAIRD, Appellant, v. VERNON S. MOSS et al., Respondents.

Frank W. Woodhead and R. P. Reddingius for Appellant.

Jarrett & Morgan for Respondents.

SHINN, P. J.—Plaintiff Laird was riding in a Chevrolet driven by Willard A. Jones when it came into collision with a Willys panel truck owned by defendant Brown and driven by defendant Moss. The Jones car was traveling south on Valjean in Los Angeles, the Moss truck east on Leadwell. The collision occurred in the intersection. Jones was killed. Laird and Moss each suffered injuries which resulted in complete loss of memory as to the circumstances surrounding the accident.

In a jury trial verdict and judgment were in favor of the defendants and plaintiff appeals.

It had rained all day and was still raining at about 4 o'clock in the afternoon. Visibility was good. There was evidence that the Chevrolet left 50 feet of skid marks up to a point 17 feet south of the north curb line of Leadwell, or a little past the center line; the Willys skidded 18 feet to the point of impact. The Chevrolet was propelled to the southeast corner of the intersection; the Willys, struck on the left front section, veered to the right, proceeded down Valjean for 180 feet, knocked over a tree and came to rest beside a garage. Moss was not thrown out. There was a building at the northwest corner of the intersection by reason of which neither driver had a clear and unobstructed view, during the last 100 feet of his approach, of traffic on the other highway for a full 100 feet from the intersection. There was no eye witness to the accident. There was evidence of observations made showing that from a point on Leadwell 100 feet west of the intersection there was a view north on Valjean of 75 feet and from 100 feet north on Valjean a view to the west on Leadwell of 67 feet. These conditions gave each driver who may have been approaching this blind intersection at a speed consistent with traversing the intersection at 15 miles per hour (Veh. Code, § 511, subd. (a) (2)), ample opportunity to see the other approaching vehicle and to stop his own in time to avoid a collision.

A 16-year-old boy testified that he was riding a bicycle northward 150 or 200 feet north of Leadwell. He did not observe either car before the collision. He heard them come together and saw the Willys going south on Valjean at a speed he estimated at 30 or 40 miles per hour. Another witness gave testimony that he was driving south on Valjean and that at a point half or three quarters of a block north of Leadwell the Chevrolet passed him. He was paying no attention to his own speed which he estimated at 25 or 30 miles per hour. He estimated that the speed of the Chevrolet was from 5 to 10 miles faster. He did not notice either car again until after the collision.

Robert E. Synder, a mechanical engineer, testified as an expert for plaintiff. He specializes in the examination of automobile accidents; he had examined some 2,000 accidents. He considered the evidence of skid marks and examined photographs of the damaged cars. From these he expressed the opinion that at about the point where Jones started to slow

down the Chevrolet was traveling about 33 miles per hour; at the time of the impact it was going 15 miles per hour; at about the point where Moss started to slow down the Willys was traveling 40 miles per hour and at the point of the collision it was going 35 miles per hour.

Dr. Dino Morelli, another specialist, testifying from the same evidence as that considered by Snyder, expressed the opinion that when brakes were applied on the Willys it was traveling 15½ miles per hour and that at the time of impact from 0 to 5 or 5½ miles per hour. At the time of impact the Chevrolet was going 15 miles per hour.

There was no evidence whether the Willys was in gear with the motor running after the collision. Neither expert undertook to answer whether it was propelled for 180 feet under its own motive power or traveled south under its momentum at the time of the collision.

The only point on the appeal which requires decision is that the court erroneously refused plaintiff's instruction as to the application of the presumption of the exercise of due care. Since both Laird and Moss had lost memory of the occurrences surrounding the accident and Jones was dead, the case was one for application of the rule of section 1963, subdivisions 4 and 33, Code of Civil Procedure, that it is presumed that every person takes ordinary care of his own concerns and obeys the law.

The critical issue was whether Moss was negligent in a manner which was a proximate cause of the accident. Contributary negligence of Laird was pleaded in the answer but there was no evidence which tended to support the plea. One or the other of the drivers was negligent, and the jury could have found with good reason that both were negligent. The verdict implies findings that Moss was not negligent and that the conduct of Jones was the sole cause of the accident.

In reaching a conclusion whether Moss was negligent it was necessary for the jury to determine whether Jones was driving in the exercise of ordinary care and in obedience to law. (*Gigliotti* v. *Nunes*, 45 Cal.2d 85 [286 P.2d 809].)

It was the duty of the court to instruct that the presumption of the use of care was applicable to the conduct of Laird, to the conduct of Moss and also to the conduct of Jones. Needless to say, the jury should have been so instructed as to leave no doubt in the minds of the jurors that the presumption ran to the conduct of Jones as well as to that of Laird and Moss.

Defendants, while conceding that the jury should have been

so instructed, contend that an instruction that was given at the request of plaintiff was adequate. (Defendants requested the same instruction, and it was refused). This instruction reads as set out in the margin.[1] Plaintiff maintains that the instruction was intended and was so worded as to make the presumption applicable only to the conduct of Laird and Moss, that he submitted another instruction which stated that the presumption was applicable to the conduct of Jones and that the court refused to give it.[2] We agree that the court should have given this instruction.

Instead of containing a simple, direct statement that the presumption was applicable to the conduct of Jones, the instruction that was given was couched in the cold, abstract wording of the statute. It singles out the parties to the action as being entitled to the presumption; it does not say so directly, but by the round-about method of saying that they are entitled to the presumption because it applies to the conduct of every person. Defendants say that "every person" would include Jones and that the jury would have so understood. We doubt that the jurors, hearing the words "every person" but once, would have understood that the court was employing those words for the purpose of instructing them to pass judgment on the conduct of Jones in the light of the presumption.

Defendants contend for a strict and literal application of the words "every person" to make them applicable to the conduct of Jones. But they would have to place a limitation upon their method of interpretation. To attribute to the instruction the

---

[1] "135-E. At the outset of this trial, each party was entitled to the presumptions of law that every person takes ordinary care of his own concerns and that he obeys the law. These presumptions are a form of prima facie evidence and will support findings in accordance therewith, in the absence of evidence to the contrary. When there is other evidence that conflicts with such a presumption, it is the jury's duty to weigh that evidence against the presumption (and any evidence that may support the presumption), to determine which, if either, preponderates. Such deliberations, of course, shall be related to and be in accordance with my instructions on the burden of proof."

[2] "135-A. The law presumes that .................... now deceased the ............ in this action, in his conduct at the time and immediately preceding the accident here in question, was exercising ordinary care and was obeying the law. These presumptions are a form of prima facie evidence and will support findings in accordance therewith, in the absence of evidence to the contrary. When there is other evidence that conflicts with such a presumption, it is the jury's duty to weigh that evidence against the presumption and any evidence that may support the presumption to determine which, if either, preponderates. Such deliberations, of course, shall be related to and be in accordance with my instructions on the burden of proof."

meaning that each party was entitled to the presumption as applied to the conduct of third persons would lead to absurdity. In the present case it would mean that Moss was entitled to the presumption that Jones was proceeding with due care and obeying the law. But instead of theorizing as to deductions the jurors might have made from a critical analysis of the wording of the instruction we look only for the meaning it would have conveyed to them upon hearing it read.

In our inquiry into the meaning the jurors would have attributed to the instruction it is illuminating to notice the meaning the attorneys for the parties gave to it. Defendants' counsel requested the same instruction, understanding that it made the presumption applicable to the conduct of Moss. They made use of a form instruction which made the instruction applicable also to the conduct of Laird. But it could scarcely have been their intention to request an instruction that made it applicable to the conduct of Jones. They would not have considered it to be their duty to request such an instruction. And plaintiff's attorneys, understanding that another instruction was needed, submitted the one that was refused. There appears to be no good reason for assuming that the jurors would have given the instruction a meaning different from the one that was entertained by the attorneys in the case.

Practitioners should not make the mistake of assuming that all the law to be applied in jury trials can be found in a book of forms. Every case has its essential factual issues. As a rule there are only a few of these that are determinative of the controversy. Much of the value of instructions can be lost by the failure to draft specific instructions to fit these issues. The standard instructions which are in common use are intended to save time and effort. It is not their purpose to dispense with analysis of the issues in the case and the preparation of appropriate special instructions.

The foregoing remarks apply not only to the instruction that was given but also to the one that was refused. Realizing that their first instruction was inadequate plaintiff's attorneys set about furnishing one that would apply the presumption to the conduct of Jones. But following the labor saving practices that have invaded the legal profession, instead of preparing an instruction of their own, which might have taken as much as 10 minutes of time and required very little effort, they pored through a book of forms and came up with the one known as 135-A which they submitted. It so happens that 135-A is apparently intended for use in a case in which a

deceased person is either a plaintiff or a defendant, whatever sort of case that might be. It is evidence that the instruction was submitted without being carefully read.

 Defendants point out that there is a blank space in the instruction that would have to be filled in with the name of Jones and that the words "the . . . in this action" are redundant. They contend that because of these inperfections the instruction was properly refused under the rule that the court has no duty to rewrite instructions or to correct those which contain misstatements of law. The rule cannot be applied here. The instruction stated the law correctly; it referred to the "deceased," which could only have meant Jones. The few redundant words could have been crossed out with the stroke of a pen. The imperfections were on a par with clerical errors that are easily corrected. Such trivial inaccuracies do not justify the refusal of an instruction where the result would be to leave the jury inadequately instructed on a material issue in the case. The instruction should have been corrected by the court and given.

 The final question is whether the error in refusing the instruction was seriously prejudicial. We have concluded that the case was a close one which could reasonably have been decided in favor of the plaintiff, and that it is not improbable that the verdict would have been different had the jury been properly instructed. We believe that the presumption of the use of due care played an important part in the decision.

There was no evidence, except the opinion evidence of the experts, that either car was traveling at a high rate of speed. Snyder had the Willys approaching the intersection at 40 miles per hour and going into collision with the Chevrolet at 35 miles per hour. Dr. Morelli had the Willys going 15½ miles per hour when the brakes were applied and practically at a standstill when the collision occurred. Strange to say, both experts gave the Chevrolet a speed of 15 miles per hour at the time of impact.

These witnesses are no doubt among the best of the experts who specialize in studying skid marks and photographs of damaged cars and reconstructing in detail the manner in which accidents occur. It is apparent from their testimony that they believe themselves to be engaged in an exact science. They maintain that their conclusions are based upon established physical facts and scientific formulae which form the basis for irrefutable deductions. Their reasoning, especially

that of Dr. Morelli, was carried through interminable hypothetical questioning and argument. After reading the testimony of these witnesses we are of the opinion that the soundness of the intricate factual deductions made from the evidence considered by the experts rested upon factors which the jurors could not intelligently evaluate. Their reliance upon assertions of facts which were claimed to be proved by the nature of the damage to the cars, such as the speed of each car, could only have been based upon the power of persuasion of the respective witnesses. Assuming that the jurors were influenced by the expert testimony we doubt that any juror, having chosen the opinion of one of the experts as to speed over the opinion of the other, would have been able to state any reason for his choice other than that one witness impressed him more favorably than the other. Since each of the experts appeared to be as well informed and as honest as the other one might suspect that the jurors may have concluded that the field of science in which the two are engaged has scarcely reached a stage of perfection.

The rule of the presumption of due care takes on great significance by reason of the absence of more persuasive evidence. The jury no doubt understood that it was presumed that Moss exercised due care and obeyed the law, but, as we have seen, the instructions failed to give Laird the benefit of the presumption as applied to the conduct of Jones. Moreover, some important facts stand out unchallenged: It was a blind intersection, each driver in the exercise of ordinary care could have seen the other in time to stop, and each failed to make the effort until it was too late. We are not persuaded that the verdict would have been the same if the jury had been properly instructed.

Other assignments of error need not be noticed.

The judgment is reversed.

Vallée, J., concurred.

Wood (Parker), J., concurred in the judgment.